(No. 11208.—Rule discharged.)

THE PEOPLE *ex rel.* The Chicago Bar Association, Relator, *vs.* JOHN S. CHARONE, Respondent.

*Opinion filed April 15, 1919—Rehearing denied June 6, 1919.*

1. DISBARMENT—*when failure to exercise good judgment will not disbar.* Mere failure of an attorney to exercise good judgment in his transactions with his clients, due to his inexperience rather than an intent to act dishonorably or unprofessionally, is not ground for disbarment.

2. SAME—*attorney should exercise diligence in discharge of his duties.* The relation of attorney and client is a fiduciary relation, and an attorney owes it to himself and to his profession to exercise diligence in the discharge of his duties.

INFORMATION to disbar.

ARTHUR DYRENFORTH, and JOHN L. FOGLE, (LLOYD M. BROWN, of counsel,) for relator.

JOHN S. CHARONE, *pro se,* (BENJAMIN P. ACKERMAN, of counsel,) for respondent.

Mr. JUSTICE STONE delivered the opinion of the court:

An information in the name of the People, on the relation of the Chicago Bar Association, praying that the name of the respondent, John S. Charone, be stricken from the roll of the attorneys of this court was filed and he was ruled to answer. Respondent was admitted to the bar by this court in December, 1913, since which time he has been practicing in the city of Chicago.

The original information contained three counts. An additional count was filed with the commissioner and notice given that on the submission of the cause as set out in the three original counts to the Supreme Court the relator would ask to amend the original information by adding thereto the additional count so filed, and that relator would file said amendment to the information before the commissioner and submit evidence in support of said additional count during the time limited by the court in which to take evidence, and that relator would rely on said amended count and the evidence taken thereunder in support of the prayer in the original information. The commissioner heard the evidence and has filed his report of findings and conclusions thereon, which evidence, findings of fact and conclusions are in substance as follows:

First count: That in 1915 respondent was retained by Julius Gaters in the matter of his divorce suit and was paid the sum of $37. Gaters testifies that respondent repeatedly told him that the divorce suit had been filed and was liable to be up most any time. Respondent testifies that he was to receive $50 in full for his services before any bill was filed, and denies that he told Gaters at any time that suit had been instituted. The respondent further testifies that he drew two bills for Gaters charging desertion on the part of the wife of Gaters; that respondent was unable to as-

certain from Gaters the date of the wife's desertion; that respondent informed Gaters that he would have to bring in two credible witnesses to substantiate the charges in the bill; that on investigation respondent was in possession of some evidence to the effect that Gaters, and not his wife, deserted; that respondent was at all times ready, willing and able to file said suit but was prevented from so doing by the failure of Gaters to pay him the full amount of $50, of which $13 is still due, and by his failure to furnish the necessary evidence to support said bill. The commissioner has found the facts and circumstances surrounding the bringing of the divorce suit as testified to by the respondent. Gaters produced in evidence two receipts: one for $37 for services in securing a divorce, showing a balance of $13, signed by the respondent; the second, on the letter-head of the respondent, on the same day, promising to file a bill for divorce on Monday, July 10, 1916, and get a decree not later than six weeks thereafter, signed by the respondent. The respondent testified, and is corroborated by Irene Shedden, to the effect that these receipts were made and delivered under duress; that Gaters came into his office, threatened respondent and compelled him to put those statements in writing, and while so writing Gaters had a razor in his hand, waiving it in a threatening manner; that Gaters threatened to cut him with the razor. It is admitted by the respondent that he received $37 and that no suit for divorce has been filed. The commissioner finds that the two receipts in question were given to Gaters because of his threats to inflict bodily injury upon the respondent; that the respondent is ready and willing to file the bill and prosecute the suit for Gaters upon the receipt of the $13 due him and the production of the necessary witnesses to support the bill. The commissioner suggests to this court that the conduct of Gaters in this matter should not receive direct or indirect commendation by finding adversely to the respondent.

Second count: That in May, 1915, through the recommendation of Gaters, Mrs. Elsie Spriggs employed respondent to secure a divorce for her and paid the respondent $25, for which he gave his receipt. In June, 1915, she paid him $15, for which he gave a receipt, and $10 more was to be paid when the decree was entered. The respondent prepared the bill for divorce and the same was docketed in the circuit court as No. B18,685. A summons issued on the bill and was delivered to the sheriff and by him returned "Not found." The respondent and Mrs. Spriggs had several conversations in his office and over the telephone relating to the whereabouts of the defendant, Spriggs. The respondent testifies in detail relative to calls made by him at various addresses given him by Mrs. Spriggs in order to locate the defendant, which testimony is undisputed. In 1916 Mrs. Spriggs accused the respondent of failing to file any bill for her, in response to which he gave her the receipts from the clerk and sheriff showing that the bill had been filed and summons issued. The commissioner finds that Mrs. Spriggs gave no information to respondent as to the whereabouts of Spriggs other than the addresses mentioned by the respondent, who was unable to locate Spriggs, and that service could not be had by publication for the reason that Mrs. Spriggs insisted that her husband was in the city of Chicago; that respondent is ready and willing to proceed with the Spriggs case upon information to secure service on the defendant and upon the production of the required evidence to substantiate the charges in the bill; that respondent has done all that he could do in the matter with the information at hand and is not guilty of negligence or bad faith toward Mrs. Spriggs.

Third count: That in November, 1915, Fred C. Schulz, agent of Sherman P. Stultz, employed respondent to prosecute a suit against Mrs. Anna Kemisch, a tenant, for money due; that respondent was paid $10 to pay costs and apply on fees and was to receive $5 extra out of money collected.

The respondent brought suit, upon which judgment was entered by default November 18, 1915, for $25, and $3 costs were taxed. Execution was issued on this judgment but was not delivered to the bailiff, due to the fact that the same became mislaid in moving the office effects of the respondent. In April, 1916, Schulz demanded the execution of the respondent and refused the respondent's request to continue the matter, whereupon the following day respondent sent the execution to Schulz. An alias execution was issued and delivered to the bailiff, who made demand upon Mrs. Kemisch and a levy. Some time after April 28, 1916, Mrs. Kemisch went to the respondent's office and paid $30 to the stenographer in charge, who delivered it to respondent, at which time Mrs. Kemisch left the copy of the execution served on her April 28, 1916. Respondent testified that upon receipt of the money he called up Schulz's office; that Schulz was not in nor did he call back; that he repeated his call, which was never answered. The respondent claimed $5 for his services and offered to return the $25 in full if the same would be accepted in full payment, which was accepted by one Richards, acting for Schulz, whereupon the respondent promised to pay the money at noon on Saturday. Schulz called the respondent's office at 11:30 on the same day and stated that nothing less than $30 would be accepted, and respondent retained the money pending a receipt from Schulz as requested. The commissioner further reported that while the preliminary proceedings against the respondent were pending before the bar association, on October 19, 1916, Schulz wrote a letter to the respondent, stating, in substance, that a replication to respondent's answer would be filed and the charges in the original complaint pressed unless the amount of $25 was paid by the respondent by Tuesday, October, 24, 1916, and that if the amount was paid the complaints and charges filed with the grievance committee of the Chicago Bar Association would be dropped. This letter was written without the knowledge

or consent of the said commissioner, the said Chicago Bar Association or any of its officers. The respondent refused to pay the money at the time designated, on the ground that he believed that such action on his part might be construed as an admission of the charges preferred against him. At the first hearing of this cause respondent tendered the $25 which he admitted was due Schulz for Stultz, with $1.50 interest, which was accepted without condition of any kind as to the issues herein involved. The commissioner finds that the attempt of Schulz to use the Chicago Bar Association as a collection agency is improper; that respondent was negligent in handling the collection of said judgment; that he should have remitted the $25 and retained the $5 pending the settlement of the controversy; that if Schulz had not changed his mind several times and had manifested some business courtesy toward the respondent the payment of the money would probably have been made without delay.

Additional count: That the substance of the evidence on the additional count tends to show that in October, 1916, S. Steinman employed one Bernstein, an expressman, to haul some household goods; that Steinman paid Bernstein by check for his services, and afterwards, because of certain differences, stopped payment on the check; that Bernstein thereupon went to the office of Steinman and in his absence seized and carried away a sewing machine belonging to Steinman, valued at $25; that Steinman employed the respondent as an attorney in his behalf; that respondent, upon the advice and consent of Steinman, procured a warrant for the arrest of the Bernstein brothers on the ground of disorderly conduct; that the arrest was made and it does not appear what disposition was made of the case, except that on suggestion of the assistant State's attorney the respondent was to either go to the State's attorney's office or bring a replevin suit; that respondent and Steinman agreed to a fee of $10 for respondent's services

in this matter, for which a receipt was given by respondent; that it appears that on December 1, 1916, Steinman paid respondent $15, and received a receipt for the same, on account of costs, and that upon payment of $9 more there were to be no more costs in the matter, and if it really became necessary to incur further costs respondent would refund the excess, and in the event of recovery respondent was to receive one-third of the amount realized. The testimony is very conflicting as to what transpired after December 1, 1916. Steinman testified that respondent was to return the money or get the machine and that respondent delayed the matter from time to time, repeatedly promising to prosecute the suit but which he did not do. It further appears that on January 19, 1917, respondent wrote a letter to Steinman, in which he stated that he had called the office of the clerk of the court and received the report that the case in controversy would definitely come up February 4, 1917; that respondent had had trouble, in that his father had been taken to the hospital and died on the morning in question; that on February 4 the matter in question would be disposed of finally. The testimony of the respondent is to the effect that when he wrote this letter he contemplated that he had ample time to file the necessary papers, secure security and have bond approved and get service in time to have the case called on the day mentioned; that respondent conferred with Steinman regarding the surety on the replevin bond; that Steinman said he did not care to ask his relatives to sign such a bond and requested the respondent to get someone to act as surety. Steinman says respondent volunteered, in the first instance, to get the surety. Respondent testifies that at his request his mother signed a blank replevin bond and schedule and the clerk O. K.'d her signature; that he tried to get Steinman down to sign the bond but could not do so. The testimony is conflicting as to whether it occurred on the 15th

or 19th of January. Some time after February 4, 1917, Steinman engaged attorney Barnett to represent him. The testimony tends to show that Steinman and Barnett, at the office of the respondent, demanded the full amount of $34 heretofore paid to the respondent; that respondent offered to return $24 to Steinman, who was advised by his attorney, Barnett, to accept it, but Steinman refused to compromise on any amount less than $34; that respondent agreed to proceed in the replevin suit if Steinman would sign the bond or he would advance the costs to Barnett, attorney for Steinman, and turn over the balance; that on the day before the first hearing in this case the respondent offered to permit Steinman to use the bond in question in the prosecution of the replevin suit under the direction of his attorney, Barnett, which was refused; that respondent made no legal tender of the money to Steinman. The commissioner finds that the $10 first paid by Steinman was for legal services rendered in the criminal court and that Steinman is not entitled to be re-paid that sum on any theory; that the $24 aforesaid was to cover court costs in a replevin suit to recover the sewing machine in question and a damage suit against the Bernsteins; that the damage suit was not to be started until after the trial of the replevin suit; that the replevin suit was never started; that the respondent was negligent in the latter matter, but to some extent this was due to lack of experience and judgment in dealing with clients and to some extent due to the unreasonableness of Steinman; that respondent should not have written the letter of January 19 unless the suit had actually been brought or respondent knew positively when he wrote the letter, because he might have anticipated the difficulty that would arise in having the bond executed by Steinman. The commissioner concludes that the respondent was unfortunate in having Steinman for a client; that respondent should have insisted upon Steinman executing the bond in question, and

upon his refusal to do so he should have promptly returned the $24 and notified Steinman that he would no longer act as his attorney.

The commissioner concludes that the evidence submitted to him on the whole record is not sufficient to show that the respondent has been dishonorable or criminal in his conduct or that he lacks good moral character, as charged in the information. The commissioner suggests to this court that respondent is a young lawyer of limited experience and of small means, forced by his circumstances to accept cases and clients of the kind mentioned in these proceedings; that although respondent failed to exercise good judgment in his transactions with Schulz and Steinman, yet such failure, in the mind of the commissioner, was due to his lack of judgment under the circumstances rather than an intent to act dishonorably or unprofessionally, or in any manner calculated to bring the courts of justice into disrepute and contempt and to tarnish the good name of the legal profession.

We have examined the evidence in this case carefully, and are of the opinion that while it does not disclose unprofessional or dishonorable conduct on the part of the respondent it does disclose that either through lack of judgment or diligence, or both, respondent has not, in at least part of the cases referred to in the information, given to the business of his client the earnest attention which his duty as an attorney at law demands. An attorney at law cannot be too careful to avoid that which would tend to destroy the confidence of his client in his diligence. The relation of attorney and client is a fiduciary relation, and every attorney at law owes it to himself and to his profession to exercise diligence in the discharge of his duties.

The commissioner has found that the evidence does not show dishonorable or unprofessional conduct, and we are of the opinion that the report of the commissioner should be affirmed and that the rule should be discharged.

*Rule discharged.*